IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

TENNEIL B. GRIES,

        Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

        Defendant.

No. 11-CV-4075-DEO

Order

_____

## I.  INTRODUCTION AND BACKGROUND

On August 18, 2008, Plaintiff filed for disability insurance benefits pursuant to Title II of the Social Security Act (the "Act), 42 U.S.C. §§ 401 et seq., as well as supplemental security income benefits pursuant to tile XVI of the Act, 42 U.S.C. §§ 1381 et seq.  Tr. 9.

Plaintiff initially claimed a disability onset date of March 1, 2007, which was later amended to August 8, 2008.  Tr. 9-11.  Plaintiff has accumulated enough credits under the Act to remain insured through December 13, 2013.  Tr. 11.  The Commissioner of Social Security ("Commissioner") denied Plaintiff's initial claims on November 20, 2008, and upon reconsideration on March 28, 2009.  Tr. 9.  On May 1, 2009, an

Administrative Law Judge ("ALJ") held a hearing to consider Plaintiff's claim.   Tr. 9.   In a decision dated November 30, 2010, the ALJ denied Plaintiff disability benefits and supplemental security income, finding there were jobs that exist in significant numbers in the national economy that Plaintiff could perform despite his limitations.   Tr. 17-18.

This Court has authority to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383 (c)(3). Since the Social Security Appeals Council denied Petitioner's request for review on July 14, 2011, the ALJ's decision constitutes the final decision of the Commissioner; and the question before this Court is whether Plaintiff was disabled, as defined in the Social Security Act, from August 8, 2008, to November 30, 2010.

## II.  FACTS

Plaintiff's mother and sister suffer from an autoimmune disorder, sometimes described as a variant of rheumatoid arthritis[1] and sometimes described as a variant of lupus,[2]

---

[1] "Rheumatoid arthritis (RA) is a long-term disease that leads to inflammation of the joints and surrounding tissues. It can also affect other organs. . .   The cause of RA is unknown.   It is an autoimmune disease, which means the body's immune system mistakenly attacks healthy tissue." *Rheumatoid*

which adversely affects their joints.  Tr. 628.  Plaintiff's father died at age 47 from a kidney stone that became obstructed and infected.  Tr. 628.

At the age of 16, Plaintiff was admitted to the hospital with sudden onset of paralysis from the waist down.  Tr. 517. His physicians thought his condition might have resulted from long-standing rheumatoid arthritis, but he eventually recovered from his paralysis without medical intervention and no final diagnosis was reached.  Tr. 517.

Plaintiff has a high school education and is currently 35 years old.  Tr. 17.  In the past, he has worked as an automobile detailer, construction worker, material handler, automobile mechanic, sewer-pipe cleaner, and heavy truck driver.  Tr. 17.  At the time of Plaintiff's administrative

---

*arthritis*, PubMed Health, available at <u>http://www.ncbi.nlm .nih.gov/pubmedhealth/PMH0001467/</u>, last visited September 27, 2012.

[2] "Systemic lupus erythematosus (SLE) is a long-term autoimmune disorder that may affect the skin, joints, kidneys, brain, and other organs. . . Symptoms vary from person to person, and may come and go.  Almost everyone with SLE has joint pain and swelling.  Some develop arthritis.  Frequently affected joints are the fingers, hands, wrists, and knees." *Systemic lupus erythematosus*, PubMed Health, available at <u>http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001471/,</u> last visited September 27, 2012.

hearing, he had no insurance and was last employed in 2008. Tr. 41.

In a personal pain fatigue questionnaire, dated August 19, 2008, Plaintiff noted that his pain was localized in his back, neck, knees, and shoulder, and that it was always present to some degree but became worse with any kind of movement, including sitting, standing, and bending.  Tr. 220. According to Plaintiff, his pain got so bad that he could hardly move, was laid out on his back, and could hardly sleep for more than two to three hours at a time.  Tr. 221.

In an adult function report, dated August 21, 2008, Plaintiff indicated he began to have bone and joint problems at the age of seventeen, and, though he prefers not to, he has since intermittently used walking aids, such as a cane, crutches, and/or braces.  Tr. 216-17.  Though capable of doing basic household chores, Plaintiff claims he can do so only sporadically between bouts of pain.  Tr. 213-14.  Overall, Plaintiff indicated his back and shoulder problems affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use his hands, complete tasks, and get along well with others.  Tr. 215.

4

On August 20, 2008, Plaintiff was examined by Dr. Krause at the Siouxland Community Health Center.  Dr. Krause noted that Plaintiff, though he had a history of chronic degenerative joint disease and juvenile rheumatoid arthritis, came in after a long break in care.  Tr. 330.  Plaintiff rated his back pain as a 7 and his shoulder pain as a 9 on scales of 0-10.  Id.  Dr. Krause prescribed Plaintiff a pain killer through the indigent program and discussed the potential for getting Plaintiff into the Iowa Cares program.  Tr. 331.

On September 4, 2008, Petitioner was again examined by Dr. Krause.  Tr. 370.  After reviewing Plaintiff's medical history, Dr. Krause noted that, though juvenile rheumatoid arthritis had been suspected, Plaintiff was never explicitly diagnosed with the condition and currently lacked the tell-tale deformities of the hands common to people with the disorder.  Tr. 370.  Dr. Krause also noted that Plaintiff was able to walk into the room without much difficulty but did exhibit tenderness at palpation over the lumbar spine.  Tr. 370.  Plaintiff, though able to move his right shoulder, complained of severe pain with minimal range of motion.  Tr. 370.  Dr. Krause indicated Plaintiff lacked insurance and had

5

requested him to fill out a disability form stating he was unable to work, but Dr. Krause explained he did not currently consider Plaintiff unable to work and was not responsible for making disability determinations.  Tr. 370.

On September 10, 2008, notes from a Dr. Taylor indicate Plaintiff was recently given anti-inflammatory medication but his pain was not brought under control; Plaintiff was experiencing bouts of stiffness in the morning.  Tr. 367.  Dr. Taylor indicated Plaintiff had difficulty doing his job, and his pain could get "quite severe."  Tr. 367.  Upon testing, Plaintiff's hand strength and range of motion of the sacroiliac and lumbar spine was good, but he was unable to raise his right arm fully above his head.  Tr. 367.

On September 11, 2008, Petitioner saw Dr. Murray in relation to painful and swollen left elbow.  Tr. 355.  Dr. Murray prescribed Plaintiff pain killers and gave him a sling for his arm.  Tr. 356.  On November 3, 2008, Dr. Taylor saw Plaintiff in relation to his elbow pain, as well as pain in his left ankle.  Tr. 361.  Dr. Taylor noted that Plaintiff had experienced swelling in other joints before but determined his current swelling was "really not that bad . . . ."  Tr. 361.

6

On November 11, 2011, Plaintiff went back to Dr. Murray who confirmed minor pain and inflammation and/or swelling in the elbow.  Tr. 410.

On September 17, 2008, Mercy Medical Center performed a Magnetic Resonance Imaging (MRI)[3] on Plaintiff's lumbar spine due to "[s]evere low back pain radiating into [his] right leg posteriorly to the heel."  Tr. 338.  The MRI revealed L4-L5 of Plaintiff's spinal column were positive for disc dehydration, a small Schmorl's node,[4] mild diffuse disc bulge, and facet arthropathy[5] with no significant narrowing of the spinal

---

[3] "Magnetic resonance imaging (MRI) is a test that uses a magnetic field and pulses radio wave energy to make pictures of organs and structures inside the body. *Magnetic Resonance Imaging (MRI)*, WebMD, available at http://www.webmd.com/a-to-z-guides/magnetic-resonance-imaging-mri, last visited September 27, 2012.

[4] A Schmorl's node is an "upward and downward protrusion (pushing into) of a spinal disk's soft tissue into the bony tissue of the adjacent vertebrae."  Schmorl's nodes are common and "usually cause no symptoms, but they reflect 'wear and tear' of the spine that has occurred over time." *Definition of Schmorl's node*, MedicineNet.com, available at http://www.medterms.com/script/main/art.asp?articlekey=14007, last visited September 27, 2012.

[5] Facet arthropathy "is degenerative arthritis affecting the facet joints in the spine." *Facet Arthropathy - Fast Facts*, About.com, available at http://arthritis.about.com/od/spine/p/facet_joints.htm, last visited September 27, 2012.

canal.  At L5-S1, Plaintiff exhibited disc dehydration with mild narrowing of the intervertebral space, mild disc bulge with mild disc protrusion, causing mild displacement of the nerve root, mild facet arthropathy, and mild to moderate foraminal narrowing.[6] An additional MRI of Plaintiff's right shoulder revealed mild tendinopathy,[7] a small tear of the tendon, and a degenerative irregularity of Acromioclavicular (AC)[8] Joint.  Tr. 339.

On November 17, 2008, consulting Disability Determination Services (DDS) physician, Dr. Griffith, reviewed Plaintiff's

---

[6] "Foraminal stenosis, or neural foraminal stenosis, refers to the narrowing of the invertebral foramen, a small hole through which the nerve exits the spine." *Foraminal Stenosis*, Atlantic Spinal Care, available at http://www.atlanticspinalcare.com/spinehealth/conditions/foraminal_stenosis/, last visited September 27, 2012.

[7] "Tendinopathy is an injury to the tendon," which may reflect tendinitis ("an inflamation of the tendon") or tendonosis ("microtears . . . in the tendon tissue with no significant inflamation"). *Tendinopathy*, UPMC, available at http://www.upmc.com/healthatoz/pages/healthlibrary.aspx?chunkiid=11518, last visited September 27, 2012.

[8] "The top of the wing bone or scapula is the acromion. The joint formed where the acromion connects to the collar bone or clavicle is the AC joint." *The AC (Acromiioclavicular) Joint*, Southern California Orthopedic Institute, available at http://www.scoi.com/acjoint.htm, last visited September 27, 2012.

medical records and completed a physical residual functional
capacity assessment.   Tr. 388-95.   Dr. Griffith determined
Plaintiff could lift and/or carry 20 pounds occasionally and
10 pounds frequently, could walk or sit 6 to 8 hours a day,
could push and/or pull 20 pounds, could climb, balance, stoop,
kneel, crouch, and crawl occasionally, and had no manipulative
limitations.   Tr. 388-91.   Dr. Griffith indicated there were
no   treating   or   examining   source   statements   regarding
Plaintiff's physical capabilities on file.   Tr. 394.

On December 1, 2008, Plaintiff went to the University of
Iowa Hospital.   Tr. 384.   Dr. Putman indicated Plaintiff was
being seen in relation to pain in his left ankle, right
shoulder, back, and right foot.   Tr. 384.   Dr. Putnam also
noted that Plaintiff reported problems with migraines.[9]   Tr.
384.

---

[9] "A migraine is a very painful type of headache.   People
who get migraines often describe the pain as pulsing or
throbbing in one area of the head.   During migraines, people
are very sensitive to light and sound.   They may also become
nauseated and vomit."   *Migraine*, MedlinePlus, available at
http://www.nlm.nih.gov/medlineplus/migraine.html, last visited
September 27, 2012.

On December 5, 2008, a lab report from the Dunes Medical Laboratory indicates Plaintiff tested negative for rheumatoid arthritis factors.[10]  Tr. 435.

On January 1, 2009, Plaintiff attended a physical therapy session at Mercy Medical Center.  Tr. 405.  Plaintiff exhibited tenderness in the right shoulder upon palpation. Tr.  Physical Therapist (PT) Jordan indicated Plaintiff likely had a partial tear of his rotator cuff, accompanied by inflamation and swelling.  Tr. 406.  PT Jordan also indicated Plaintiff was unable to lift objects overhead or to reach in front or to the side.  Tr. 406.  On March 8, 2009, Plaintiff was discharged from physical therapy due to a failure to show up for subsequent appointments.  Tr. 408.

On March 24, 2009, consulting Disability Determination Services (DDS) physician, Dr. Nitzke, reviewed Plaintiff's medical records and completed a physical residual functional

---

[10] "The rheumatoid factor test is commonly ordered test to help diagnose rheumatoid arthritis.  This test measures rheumatoid factor, which is an antibody in the blood that's present in many people with RA.  In fact, the rheumatoid factor blood test is eventually positive in 70% to 80% of people with RA, although in early arthritis the percentage may be much smaller." *Rheumatoid Factor Test*, WebMD, available at http://www.webmd.com/rheumatoid-arthritis/guide/rheumatoid-f actor-test, last visited September 27, 2012.

capacity assessment.  Tr. 445-52.  Dr. Nitzke reached the same conclusions as DDS consultant Dr. Griffith.  Tr. 451.

On June 3, 2009, tests from the Department of Neurophysiology at Mercy Medical Center indicated Plaintiff suffered from sleep apnea, resulting in a loss of rapid eye movement (REM) sleep.[11]  A sleep diary kept by Plaintiff indicated he awoke 3-8 times per night and felt groggy and drowsy in the mornings.  Tr. 568.  Plaintiff was given a mask to aid his sleep, but the sleep mask was subsequently taken from him when he lost his insurance coverage.  Tr. 567.

On August 20, 2009, Plaintiff had and X-ray of his elbow and right foot.  Tr. 564.  Interpreting the results, Dr. Stephens indicated Plaintiff had mild degenerative changes in a joint of one toe and a chronic ununited fracture of another toe.  Tr. 564.  Dr. Stephens also noted that while there were no significant degenerative changes to Plaintiff's elbow,

---

[11] "Researchers have determined that sleep is made up of 4 stages of non-REM sleep, and REM sleep.  To be truly refreshing, sleep needs to include all of the stages . . . Non-REM sleep is important because it gives the body a chance to physically restore and heal itself.  REM sleep seems to help the mind restore." *Disorders of REM Sleep*, Sleep-Problems.Org, available at http://www.sleep-problems.org /Disorder-Of-Rem-Sleep.html, last visited September 27, 2012.

there was a small amount of calcification at the point where the tricep muscle attached to the elbow.  Tr. 565.

From December of 2008, to October of 2009, Plaintiff regularly[12] visited his primary care physician, Dr. Swanson. Tr. 421-40 and 523-63.  Dr. Swanson, while short on exposition in relation to Plaintiff's limitations, thoroughly examined Plaintiff on each visit, reviewed his existing medical records, referred him to other specialists, and treated Petitioner's chronic back and shoulder pain, sleep disorder, and mental health, as well as prescribed a variety of medications in relation thereto.[13]  Tr. 421-40 and 523-63.

On March 17, 2009, Dr. Swanson indicated Plaintiff's back condition had not improved with moderate treatment and recommended microdiscectomy[14] surgery.   Tr. 778.   Prior to

---

[12] The dates Plaintiff saw Dr. Swanson from December 2008 to October of 2009 are:  December 5, 2008; December 10, 2008; December 30, 2008; January 8, 2009; February 12, 2009; February 13, 2009; March 12, 2009; March 18, 2009; April 16, 2009; May 2, 2009; May 14, 2009; June 25, 2009; July 27, 2009; August 20, 2009; August 21, 2009; and October 7, 2009.

[13] See Attached Exhibit A.

[14] "A discectomy is a surgery done to remove a herniated disc from the spinal canal. . .   A discectomy is performed under general anesthesia.  The procedure takes about an hour, depending on the extent of the disc herniation, the size of

surgery, notes from Dr. Ragnarsson indicated Plaintiff had been "plagued with chronic lumbar back pain symptoms, and radiating leg symptoms, primarily through the right hip and buttock and thigh and calf." Tr. 789. He also indicated that, through the years, the intensity of Plaintiff's pain had "fluctuated," but the pain had been more or less constant in "recent years" and rendered him "unable to work since August of last year." Tr. 789.

Post-surgery notes indicate that a moderate to large extruded disc herniation, which resulted in nerve root compression, was removed. Tr. 778 and 792. Soon after the surgery, Plaintiff began attending physical therapy. Tr. 755. Notes indicate Plaintiff was unable to squat, bend, walk long-distances, or climb stairs and was only able to move from lying to sitting, sit, balance, walk a short distance, push, and pull with great difficulty. Tr. 762. After two visits,

the patient, and other factors. . . In order to remove the fragment of herniated disc, your surgeon will make an incision over the center of your back . . . then carefully dissects the muscles away from the bone of your spine. Using special instruments, your surgeon removes a small amount of bone and ligament from the back of the spine." Jonathan Cluett, M.D., *Lumbar Discectomy*, About.com Orthopedics, available at http://orthopedics.about.com/cs/herniateddisk/a/ruptureddisk_3.htm, last visited September 27, 2012.

13

Plaintiff's physical therapy was discontinued due to a failure to show for appointments.   Tr. 755.   At the ALJ hearing, Plaintiff testified that since his surgery, his symptoms have grown worse.   Tr. 41.

From June of 2009, to February of 2010, a Licensed Independent Social Worker (LISW), LISW Clausen, saw Plaintiff for severe, major depressive disorder and prescribed anti-depressants.   Tr. 456-515.   On June 11, 2009, LISW Clausen indicated Plaintiff had problems with pain, anger, stress, and depression and assigned Plaintiff a Global Assessment of Functioning (GAF) score of 55.[15]   Tr. 513.   Notes from August 7, 2009, indicate Plaintiff had the following stressors: financial strain, occupational concerns, and "issues with primary support and social environment," and Plaintiff was again assigned a GAF score of 55.   Tr. 494.   Subsequent notes

---

[15] "The GAF Scale may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure . . . The GAF scale is divided into 10 ranges of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed., Text Revision 2000).  A score between 51 and 60 indicates "moderate difficulty in social occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 32 and 34 (4th ed., Text Revision 2000).

indicate Plaintiff regularly felt depressed, irritated, and stressed but otherwise provide little detail.  Tr. 456-515.

On March 22, 2010, Dr. Ijdo, a doctor of internal medicine specializing in rheumatology, saw Plaintiff at the University of Iowa Hospital.  Tr. 517-522.  Dr. Ijdo indicated Plaintiff suffered from chronic intermittent joint pain which would occasionally result in swelling, pain, and redness of the skin covering joints in his hands and feet, accompanied by chronic bouts of migraines and lower extremity numbness.  Tr. 517-18.  Dr. Ijdo also noted that Plaintiff had photographic documentation of the episodes of swelling and redness.  Tr. 518.  X-rays revealed Plaintiff had sclerosis[16] of the pubis region and a cam-type femoracetabular impingement.[17]  Tr. 521. Overall, Dr. Ijdo, despite Plaintiff's confirmed joint

---

[16] Sclerosis is "a hardening or induration of a tissue or part, or an increase of connective tissue or the like at the expense of more active tissue." *sclerosis*, Dictionary.com, available at http://dictionary.reference.com/browse/sclerosis, last visited September 27, 2012.

[17] A cam-type femoroacetabular impingement "occurs because extra bone extends out over the normal rim of the acetabulum [the hip bone socket]. A bump forms on the edge of the femoral head [hip ball] that grinds the cartilage inside the acetabulum." *Femoroacetabular Impingement (FAI)*, OrthoInfo, available at http://orthoinfo.aaos.org/topic.cfm?topic=A00571, last visited September 27, 2012.

problems, did not feel the evidence justified a finding that Plaintiff suffered from rheumatoid arthritis or related autoimmune disease.  Tr. 521.

On June 16, 2010, Plaintiff got into an altercation, fell, and suffered from a fracture in the head of his humerus, or the long bone connecting the shoulder to the elbow, and a tear of a tendon associated with the humerus.  Tr. 599, 624 and 695.  A subsequent X-ray also showed a deformity of the scapula, or the wing bone, which Dr. Liewer thought could have resulted from a prior injury, as well as calcification of the rotator cuff.  Tr. 700.  On July 26, 2010, PA Wilkinson noted that Plaintiff had a limited range of motion and could only lift his arm to 90 degrees.  Tr. 598.  Subsequently, Plaintiff attended 3 weeks of physical therapy 3 times a week.  Tr. 624. Though he experienced some increased range of motion, he was still experiencing pain.  Tr. 624.  Physical therapy notes from October 5, 2010, indicated Plaintiff still had difficulty with overhead reaching and reaching behind the back and head with his left arm and still experienced increased pain with movement in all directions.  Tr. 674.  Plaintiff was also unable to perform repetitive or sustained motions with his

right arm and exhibited limited strength in his right
shoulder. Tr. 674. However, PT Freeman felt Plaintiff's
rehabilitation potential was good. Tr. 674.

In an interrogatory provided by the SSA office dated
September 24, 2010, Plaintiff indicated he could walk up to a
block before he had to rest, could stand, so long as he could
shift his weight around, for probably an hour, and could sit
for 2 hours maximum. Tr. 262. In a typical week, Plaintiff
indicated he spent two to three days bedridden. Tr. 263. He
also indicated he could not perform household chores such as
vacuuming, dusting, sweeping, washing dishes, scrubbing
floors, mowing the lawn, making beds, doing the laundry,
cooking or other similar activities due to limitations in his
ability to bend and stand for extended periods of time. Tr.
264.

On October 10, 2010, an ALJ conducted Plaintiff's
disability hearing. Tr. 28-58. At the hearing, Plaintiff
testified that his primary problems related to his lower back
and shoulder. Tr. 46. His back problems sometimes caused his
legs to go numb, made him unable to sit or stand for long
periods of time, and caused sharp pains in his hips when

17

walking and sitting.  Tr. 46.  Plaintiff also indicated that his physical ailments exacerbated his depression and interfered with his ability to get a good nights rest.  Tr. 45.  Finally, Plaintiff claimed to develop migraines, which sometimes confined him to the house for days, on an almost weekly basis.  Tr. 45.

Plaintiff's mother Trudy Gries, also testified at the hearing.  Tr. 48.  In her opinion, her son suffered from the same autoimmune disease as she and her daughter suffered.  Tr. 50.  She stated she often goes over to Plaintiff's house to cook and clean for him and help him to the bathroom.  Tr. 51. Finally, she claimed he had braces, a walker, and a cane but doesn't want others to know about it.  Tr. 52.

At the time of the administrative law hearing, Plaintiff was on methadone, naproxen, gabapentin, and tramadol for his joint, shoulder, and back pain.[18]  Tr. 41.  He was also taking Atenolol for high blood pressure and Nortiptyline and Fluoxetine for depression and anxiety.  Tr. 41.

On November 8, 2010, prior to the ALJ issuing his decision, Dr. Swanson wrote a letter to the Commissioner to

---

[18] See attached Exhibit A for definitions of medications.

18

express his opinion that, "due to a combination of both psychiatric issues and severe musculoskeletal degenerative disease[, Plaintiff] should be labeled as disabled." Tr. 26. Dr. Swanson indicated he had been Plaintiff's primary physician dating back to about the summer of 2000, but that, between 2007 and 2010, his care had been "inconsistent" because Plaintiff did not have the requisite insurance and Dr. Swanson had been working at a facility that referred uninsured patients to the Community Health Center. Tr. 26. Dr. Swanson thought Plaintiff's

> primary problem was musculoskeletal problems of all different kinds probably related to a combination of an inherited rheumatological disorder that his mother also carries that has been called by some rheumatoid arthritis or some as a lupus[19] variant.

Tr. 26.

---

[19] "Systemic lupus erythematosus (SLE) is a long-term autoimmune disorder that may affect the skin, joints, kidneys, brain, and other organs . . . Systemic lupus erythermatosus (SLE) is an autoimmune disease, which means the body's immune system mistakenly attacks healthy tissue. This leads to long-term (chronic) inflammation." *Systemic lupus erythematosus*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001471/, last visited September 27, 2012.

III.  **THE ALJ'S DECISION**

Under the authority of the Act, the Social Security Administration (SSA) has established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to benefits.  20 C.F.R. §§ 404.1520 and 416.920.  The five successive steps are:  (1) determination of whether claimant is engaged in "substantial gainful activity," (2) determination of whether claimant has a "severe medically determinable physical or medical impairment" that lasts for at least 12 months, (3) determination of whether claimant's impairment or combination of impairments meets or medically equals the criteria of a listed impairment, (4) determination of whether claimant's Residual Functional Capacity (RFC) indicates an incapacity to perform the requirements of his/her past relevant work, and (5) determination of whether, given claimant's RFC, "age education and work experience," claimant can "make an adjustment to other work."  20 C.F.R. § 404.1520(4)(i-v) and 416.920(a)(4)(i-v).

At step one, if Plaintiff is engaged in "substantial gainful activity" within the period he claims to be disabled, there is no disability during that period.  20 C.F.R. §§

20

404.1520(a)(4)(i) and 416.920(a)(4)(i). The ALJ found
Plaintiff had not engaged in substantial gainful activity
since August 8, 2008. Tr. 11.

At step 2, if Plaintiff does not have a "severe medically
determinable physical or mental impairment" that lasts at
least 12 months, there is no disability. 20 C.F.R.
§404.1520(a)(4)(ii) and 416.920(a)(4)(ii). The ALJ found
Plaintiff had the following severe impairments: lumbar
degenerative disc disease, bilateral shoulder impairments,
obstructive sleep apnea, and obesity. Tr. 11. The ALJ found
the medical evidence did not support a finding of rheumatoid
arthritis,[20] and Plaintiff's depression, anxiety disorder,
migraine headaches, and swelling of multiple joints resulted
in no more than minimal restrictions on his ability to perform
basic work-related activities and were, therefore, non-severe.
Tr. 11-12.

At step 3, if Plaintiff's impairments meet or medically
equal the criteria of an impairment listed in 20 C.F.R. Part

---

[20] "Rheumatoid arthritis (RA) is a long-term disease that
leads to inflammation of the joints surrounding tissues. It
can also affect other organs." *Rheumatoid arthritis*, PubMed
Health, available at http://www.ncbi.nlm.nih.gov/pubmed
health/PMH0001467/, last visited September 27, 2012.

404, Subpart P, Appendix 1, and last at least 12 months,
Plaintiff is deemed disabled.   20 C.F.R. §§ 404.1520(e) and
416.920(a)(4)(iii).   The ALJ found Plaintiff did not have an
impairment or combination of impairments that met or medically
equaled a listed impairment.   Tr. 13.

Before proceeding to step 4 and 5, the ALJ must determine
Plaintiff's RFC.   RFC is the "most" a person "can still do"
despite their limitations.   20 C.F.R. § 404.1545(a)(1).   The
ALJ found Plaintiff had the following RFC:

> to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) as he can lift
> or carry 20 pounds occasionally and 10
> pounds frequently and sit, stand, or walk
> for at least 6 hours in an 8-hour workday.
> He can occasionally climb, balance, stoop,
> kneel, crouch, and crawl.   He has a valid
> driver's license.   He should avoid overhead
> reaching but has no restriction in working
> in front of his body or with his hands.

Tr. 13.

At step 4, if, given Plaintiff's RFC, Plaintiff can still
perform their past relevant work, there is no disability.   20
C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv).   The ALJ
found Plaintiff was unable to perform any past relevant work.
Tr. 17.

At step 5, if, given Plaintiff's RFC, age, education, and work experience, Plaintiff can make an adjustment to other work, there is no disability. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v). This step requires the ALJ to provide "evidence" that Plaintiff could perform "other work [that] exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2). In other words, at step 5, the burden of proof shifts from Plaintiff to the Commissioner. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). At the administrative level, an ALJ generally calls a Vocational Expert (VE) to aid in determining whether this burden can be met.

In this case, the ALJ found there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. Tr. 17. The ALJ's finding was based on the Plaintiff's RFC, as determined by the ALJ and the testimony of a vocational expert. Tr. 18. Specifically, the vocational expert testified that Plaintiff could perform the jobs of bookkeeping, driving, cashier, food preparation, and packaging, as well as 80% of other light and sedentary jobs. Tr. 18 and 55.

**IV.   LAW AND ANALYSIS**

In order for a plaintiff to qualify for disability benefits, they must demonstrate they have a disability as defined in the Social Security Act (the "Act").  The Act defines a disability as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. § 423(d)(1)(A).

**A.   Standard of Review**

This Court's role in review of the ALJ's decision requires a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is less than a preponderance but enough that a reasonable mind might find it adequate to support the conclusion in question.  <u>Juszczyk v. Astrue</u>, 542 F.3d 626, 631 (8th Cir. 2008) (citation omitted).  This Court must consider both evidence that supports and detracts from the ALJ's decision.  <u>Karlix v. Barnhart</u>, 457 F.3d 742, 746

(8th Cir. 2006) (citation omitted).   In applying this standard, this Court will not reverse the ALJ, even if it would have reached a contrary decision, as long as substantial evidence supports the ALJ's decision.   Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004).   The ALJ's decision shall be reversed only if it is outside the reasonable "zone of choice." Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted).

This Court may also ascertain whether the ALJ's decision is based in legal error.   Lauer v. Apfel, 245 F.3d 700, 702 (8th Cir. 2001).   If the ALJ applies an improper legal standard, it is within this Court's discretion to reverse his/her decision.   Neal v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005) and 42 U.S.C. § 405(g).

**B. Plaintiff's Arguments**

Plaintiff, through appointed counsel, makes the following arguments:  (1) the ALJ improperly discredited the opinion of Dr. Swanson; (2) the ALJ erred in deferring to the opinion of the non-examining doctors; and (3) the ALJ improperly discredited the lay evidence, including Plaintiff's subjective

25

complaints and Plaintiff's mother's third-party observations. Docket No. 12.

### C.  Dr. Swanson's Medical Opinion

The regulatory guidelines clearly state that the Commissioner must generally give more weight to the opinions of treating physicians and physicians who have examined a Plaintiff on multiple occasions.  See 20 C.F.R. § 404.1527(d). If a treating source's opinion on "the nature and severity" of a plaintiff's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record as a whole, it is entitled "to controlling weight."  20 C.F.R. § 404.1527(d)(3).  Even if a treating physician is not given controlling weight, an ALJ must "always give good reasons . . . for the weight" given a treating physician.  20 C.F.R. § 404.1527.

The ALJ noted that he did not give "great weight" to Dr. Swanson's opinion for the following reasons:  (1) his opinion was not supported by his treatment notes; (2) his opinion was inconsistent with the record as a whole; (3) his treatment of patient was inconsistent; (4) his opinion was partially based

on Plaintiff's mental health though there is no indication he treated Plaintiff for mental health or reviewed Plaintiff's mental health records; (5) he failed to mention Plaintiff's alcoholism; and (6) his opinion that Plaintiff is disabled is a vocational finding, rather than a medical opinion. Tr. 15.

It is true that Dr. Swanson's treatment notes, and there are a lot of them, neither gush on about the amount of pain Plaintiff is in, nor do they assign limitations, but they also do not state that Plaintiff felt good or that Plaintiff was able to function in a manor consistent with full-time employment. Dr. Swanson was Plaintiff's primary care physician, and, as such, was concerned with Plaintiff's overall health; and his notes, while exhaustive in relation to the general categories of Plaintiff's health, do not go into detail or elaborate upon Plaintiff's specific ailments. In this Court's experience, this is typical of notes from a primary care physician and does not constitute substantial evidence as to whether a plaintiff is or is not disabled.

The facts are that Dr. Swanson repeatedly examined Plaintiff, referred him to specialists and a counselor in relation to his back, joint and mental health issues, and

eventually recommended surgery for his lower back; all of
which is consistent with Dr. Swanson's ultimate determination
that Plaintiff was disabled. Clearly, Dr. Swanson, better
than anybody else on record, understood the interaction of
Plaintiff's various ailments; and this Court is persuaded the
ALJ's decision to discredit Dr. Swanson's opinion due to an
inconsistency between his treatment notes and ultimate opinion
is not supported by substantial evidence on the record as a
whole.

The ALJ noted Dr. Swanson, whom the ALJ mistakenly refers
to as "Dr. Thorson," indicated his treatment of Plaintiff had
been sporadic. Tr. 15. The ALJ also noted Dr. Swanson
indicated that he had only been Plaintiff's physician as of
the day he wrote his opinion that Plaintiff should be deemed
disabled. Tr. 15. While a single visit does not qualify a
physician as treating, this Court is persuaded the ALJ
improperly took select portions of Dr. Swanson's letter out of
context and failed to consider the record as a whole. In his
letter to the SSA, Dr. Swanson notes that he was Plaintiff's
primary care physician off and on for the past 10 years; and
records indicate that he treated Plaintiff from September 17,

2008, to October 7, 2009, a critical period in which Plaintiff's conditions became increasingly worse on more than a dozen occasions.  The record is clear:  no other physician spent even a fraction as much time dealing with Plaintiff's health issues as Dr. Swanson.  Furthermore, it is illogical to undermine Dr. Swanson's credibility for gaps in a 10 year treatment history while giving greater weight to the opinions of consulting physicians who neither examined nor met the Plaintiff.

The ALJ is simply incorrect when he states that Dr. Swanson did not treat Plaintiff in relation to his mental health.  Dr. Swanson's notes consistently indicate Plaintiff suffers from an anxiety disorder and he prescribed various medications, including, at one point or another, Abilify,[21]

---

[21] Abilify is a commercial name for Aripiprazole. "Aripiprazole is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions) in adults and teenagers 13 year of age and older. It is also used alone or with other medications to treat episodes of mania or mixed episodes (symptoms of mania and depression that happen together) in adults, teenager, and children 10 year of age and older with bipolar disorder (manic-depressive disorder, a disease that causes episodes of depression, episodes of mania, and other abnormal moods)." *Aripiprazole*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/, last visited September 27,

Depakote,[22] and Zoloft.[23]   Tr. 533.   Furthermore, Dr. Swanson also specifically references the fact that Plaintiff was seeing a counselor in relation to his mental health issues, and so it stands to reason he had access to and reviewed those notes.   Tr. 535.

The ALJ's assertion that Dr. Swanson failed to mention Plaintiff's alcoholism is also incorrect.   On April 2, 2009, Dr. Swanson specifically noted Plaintiff was having problems with his sobriety and planned to try not to drink for a month.

---

2012.

[22] Depakote is a commercial name for Valproic Acid. "Valproic acid is used alone or with other medications to treat certain types of seizures.  Valproic acid is also used to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder . . . ."  *Valproic Acid*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/, last visited September 27, 2012.

[23] Zoloft is a commercial name for Sertraline. "Sertraline is used to treat depression, obsessive-compulsive disorder (bothersome thoughts that won't go away and the need to perform certain actions over and over), panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks), posttraumatic stress disorder (disturbing psychological symptoms that develop after a frightening experience), and social anxiety disorder (extreme fear of interacting with other or performing in front of other that interferes with normal life)."  *Sertraline*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017/, last visited September 27, 2012.

Tr. 545. Regardless, throughout the record, Plaintiff consistently indicates he drinks perhaps a six pack a weekend; and there is no evidence contradicting this other than an emergency room report indicating Plaintiff injured his left shoulder in an altercation while intoxicated. Though a six pack a weekend is quite a lot of alcohol for some, no physician on record expressed a clear concern that Plaintiff's alcohol use was exacerbating his condition.

Overall, the ALJ failed to give proper weight to Dr. Swanson's opinion.

**D.   State Agency Medical Consultants**

If the medical evidence on record is inconsistent, an ALJ has a duty to weigh the evidence. § 404.1527(c)(2). In aid of this task, the regulations create a general hierarchy of medical evidence, distinguishing the relative weight various sources of medical evidence should be given. § 404.1527(d). At the top of the hierarchy are opinions from treating physicians, next are non-treating, examining source opinions, and, finally, there are opinions from non-examining sources, such as state consultants, whose opinions are limited to a review of a plaintiff's medical history. <u>Id.</u>

Of course, this hierarchy is not absolute. The opinions of treating physicians are not automatically given more weight than the opinions of examining and non-examining physicians. The regulations go on to discuss a number of factors to be considered when assessing the weight of medical opinions. § 404.1527(d)(2)-(6). For instance, treating opinions should be viewed in light of the "[l]ength of the treating relationship and frequency of examination," as well as the "[n]ature and extent of the [treating] relationship," including the type of treatment provided and "the extent of examinations and testing . . . provided." § 404.1527(d)(2). In addition, treating, examining, and non-examining source opinions should all be evaluated in terms of the relevant evidence used to support the opinion, the internal consistency of the opinion, the specialization of the source of the opinion, and other factors a plaintiff or others bring to the attention of the Commissioner. § 404.1527 (d)(3)-(6).

After considering the regulatory guidelines and thoroughly reviewing the record, this Court is persuaded that the ALJ's decision to give substantial weight to the non-examining state agency medical consultants on record was

outside the reasonable zone of choice. Tr. 16. Simply stated, the non-examining state agency medical consultants lacked a substantial portion of the record and never examined or treated the Plaintiff. Dr. Griffith reviewed Plaintiff's medical records on November 17, 2008. Dr. Nitzke reviewed Plaintiff medical records on March 24, 2009. Neither of these non-examining state agency medical consultants, because these records did not yet exist, considered Plaintiff's problems with sleep apnea; Plaintiffs degenerative changes in his right elbow and foot; Plaintiffs failure to improve after his back surgery; Plaintiff's diagnosis of major depressive disorder; Plaintiff's problems with anxiety; Plaintiff's continued migraines; Plaintiff's sclerosis of the pubis region; Plaintiff's deformities in his scapula; or Dr. Swanson's opinion that Plaintiff should be considered disabled. Again, non-examining physicians are limited to a review of the record. When they lack substantial portions of the record, it stands to reason that their opinions are not supported by substantial evidence on the record as whole. This is especially true when a plaintiff's primary care physician, who

has examined and treated a plaintiff for a number of years,
gives a subsequent, contrary opinion.

### E.   Layperson Evidence

The regulations explicitly require an ALJ to not only
weigh the medical evidence but also consider lay observations
of a Plaintiff's limitations, including limitations
attributable to a Plaintiff's subjective accounts of pain or
other symptoms.   20 C.F.R. § 404.1545(a)(3).   Based on the
general substantial evidence on the record as a whole standard
of review, a District Court should defer to an ALJ's
determination that a plaintiff's allegations lack credibility
"as long as the ALJ explicitly discredits" layperson
"testimony and gives a good reason for doing so." Wildmann v.
Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Schultz v.
Astrue, 479 F.3d 979, 983 (8th Cir. 2007)).

In Polaski v. Heckler the Eighth Circuit held that an ALJ
must not dismiss a plaintiff's subjective allegations based
solely on a lack of objective evidence. 739 F.2d 1320, 1322
(8th Cir. 1984).   An ALJ must consider all evidence, including
a plaintiff's work record, statements from physicians, and
statements from third parties relating to the following:

> 1) the [plaintiff's] daily activities;
> 2) the duration, frequency and intensity of
> the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects
> of medication; [and]
> 5) functional restrictions.

Id.

The ALJ's findings in relation to the layperson evidence on record were as follows: (1) Plaintiff's daily activities were inconsistent with disability; (2) Trudy Gries' opinion was inconsistent with the medical record; (3) statements from Plaintiff's former employer were inconsistent with disability; and (4) the fact that Plaintiff's paycheck was being garnished at his last job "casts some doubt on his motivation for work." Tr. 15 and 16.

The ALJ noted that Plaintiff spends time with his children, drives his uncle around, watches television, has dinner with friends, and occasionally reads a newspaper or magazine. Tr. 15. Apparently, the ALJ thinks these activities are inconsistent with disability; this Court respectfully disagrees. A plaintiff's account of simple, routine daily activities is not incompatible with a plaintiff's "contention that [he] is unable to hold a full time job." Ford v. Astrue, 518 F.3d 979, 983 (8th Cir. 2008).

35

"[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995). "[I]t is well settled law that a 'claimant need not prove [he] is bedridden or completely helpless to be found disabled.'" Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

Though Trudy Gries' opinion that her son had an autoimmune disorder was inconsistent with portions of the record, she is not a doctor; and there is neither any indication that she has reviewed her son's medical file, nor that she, as a layperson, should have reviewed it. Furthermore, Dr. Swanson concluded Plaintiff's musculoskeletal problems were "probably related to a combination of an inherited rheumatological disorder that his mother also carries that has been called by some rheumatoid arthritis or some as a lupus variant." Thus, Ms. Gries' opinion was not as far-fetched as the ALJ portrayed it and was in fact in line with the most persuasive medical opinion on record.

36

The work activity questionnaire provided by Plaintiff's former employer is a check the box form.  Tr. 225-27.  It indicates, on the one hand, Plaintiff was unable to complete all his duties without special assistance and operated at 90% when compared to other employees; on the other hand, it indicates Plaintiff completed his work in the same amount of time as other employees, usually reported to work on time, and did not require special accommodations.  Tr. 225-27.  Overall, the questionnaire, as far as this Court is concerned, provides very little useful information and is contradictory. Furthermore, it deals with a time period prior to Plaintiff's claimed onset of disability, and so has very little probative value.

This Court simply disagrees with the ALJ's final contention that the garnishment of Plaintiff's work-check has anything to do with the credibility of Plaintiff's allegations.  A Court should not simply ignore a plaintiff's subjective allegations of pain because he has money troubles. The entire concept of disability is to help alleviate the financial troubles of those unable to fend for themselves.

Overall, the limitations Plaintiff and his mother ascribed to Plaintiff were consistent; and, in this Court's opinion, the ALJ has failed to provide a good reason to doubt them.

## V.  CONCLUSION

It is clear the ALJ erred in several respects.  Most notably, he discredited the opinion of Plaintiff's primary care physician who was, out of all of the doctors on record, in the best position to give an opinion as to Plaintiff's functional limitations.  He also gave the most weight to the non-examining, state agency, medical consultants though they did not have access to a substantial portion of the records. Finally, he discredited the opinions of Plaintiff and his mother without providing a good reason for doing so.

The question thus becomes whether this Court should remand for further consideration or solely for the purpose of awarding benefits.  This Court has the authority to reverse a decision of the Commissioner, "with or without remanding the cause for rehearing," but the Eighth Circuit has held that a remand for award of benefits is appropriate only where "the record 'overwhelmingly supports'" a finding of disability.  42

U.S.C. 405(g); <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1011 (8th Cir.
2000) (citing <u>Thompson v. Sullivan</u>, 957 F.2d 611, 614 (8th
Cir. 1992)).

After thoroughly considering the record, this Court is
persuaded that the overwhelming weight of the evidence
supports a finding of disability.  Plaintiff had a veritable
laundry list of degenerative joint and muskuloskeletal issues,
as well as psychiatric issues.  Overall, this Court agrees
with Dr. Swanson that a combination of Plaintiff's conditions
has rendered him disabled.  **Therefore, the decision of the ALJ**
**is reversed and remanded solely for the calculation of**
**benefits from the time when Plaintiff was first diagnosed with**
**major depressive disorder on June 5, 2009.**

Application for attorney fees pursuant to the Equal
Access to Justice Act, 28 U.S.C. § 2412 (EAJA), must be filed
within thirty (30) days of the entry of final judgment in this
action.  Thus, unless this decision is appealed, if Gries'
attorney wishes to apply for EAJA fees, it must be done within
thirty (30) days of the entry of the final judgment in this
case.

39

**IT IS SO ORDERED** this 28th day of September, 2012.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa

**Exhibit A**

**Atenolol:**  "Atenolol is used alone or in combination with other medications to treat high blood pressure.  It also is used to prevent angina (chest pain) and improve survival after a heart attack.  Atenolol is in a class of medications called beta blockers.  It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure."  *Atenolol*, PubMed Health, available at http://www.ncbi. nlm.nih.gov/pubmedhealth/PMH0000819/, last visited September 27, 2012.

**Fluoxetine:**  "Fluoxetine (Prozac) is used to treat depression, obsessive-compulsive disorder (bothersome thoughts that won't go away and the need to perform certain actions over and over), some eating disorders, and panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)."  *Fluoxetine*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/, last visited September 27, 2012.

**Gabapentin:**  "Gabapentin capsules, tablets, and oral solution are . . . used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain of aches that may last for months or years after an attack of shingles).

**Methadone:**  "Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers . . . Methadone is in a class of medications called opiate (narcotic) analgesics.  Methadone works to treat pain by changing the way the brain and nervous system respond to pain."  *Methadone*, PubMed Health, available at http://www.ncbi.nlm. nih.gov/pubmedhealth/PMH0000591/, last visited September 27, 2012.

**Neproxen:**  "Prescription neproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), juvenile arthritis (a form of joint disease in children), and ankylosing spondylitis (arthritis that mainly affects the spine)."  *Naproxen*, Pub Med Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH_0000526/, last visited September 27, 2012.

**Nortriptyline:**  "Nortriptyline is used to treat depression. Nortriptyline is in a group of medications called tricyclic antidepressants.  It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance."  *Nortriptyline*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000732/, last visited September 27, 2012.

**Tramadol:**  "Tramadol is used to relieve moderate to moderately sever pain . . .  Tramadol is in a class of medications called opiate agonists.  It works by changing the way the body senses pain."  *Tramadol*, PubMed Health, available at http://www.ncbi_.nlm.nih.gov/pubmedhealth/PMH0000960/, last visited September 27, 2012.